# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# DOCKET NO. 1:11-CR-80-MR-DSC

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **MEMORANDUM AND RECOMMENDATION** |
| ) | |
| JAMES ROY BOONE, ) | |
| ) | |
| Defendant. ) | |

THIS MATTER is before the Court on the Defendant's "Motion to Suppress Evidence" (Doc. 16) filed December 20, 2011. The Government's "Response To Motion to Suppress" (Doc. 20) was filed December 28, 2011. The undersigned conducted an evidentiary hearing on January 10, 2012. On January 17, 2012, the Government filed its "Government's Brief in Opposition to Defendant's Motion to Suppress." (Doc. 25). On January 23, 2012, Defendant filed his "Reply Memorandum in Support of Motion to Suppress Evidence." (Doc. 26). On January 24, the Government filed its "Reply to Response" (Doc. 27) and Defendant filed his "Sur-Reply Memorandum in Support of Motion to Suppress Evidence."(Doc. 28). The subject Motion is now ripe for disposition.

## I. FACTUAL BACKGROUND AND FINDINGS

The events giving rise to this Motion occurred on the evening of January 23, 2011. Mitchell County Deputy Sheriff Phil Caudill was on routine patrol near the Yancey-Mitchell county line in the Estatoe community. Caudill had been a full-time deputy sheriff for approximately three months. Prior to that time, he had served as a reserve deputy for the same department for approximately one year. Caudill's shift Captain had advised him about a rash of copper, scrap metal, and vehicle part

thefts in this area. The Captain had ordered extra patrols to deter these crimes. Caudill testified that the Sheriff's Department has responded to hundreds of calls from that area and that he believed it to be the highest crime area in Mitchell county. Defense witness Lee Braswell, who leases the subject property, testified that he took precautions such as keeping odd hours and staying overnight in order to deter potential thefts.

At approximately 10:30 p.m., while on patrol in this area, Caudill drove by a commercial building which he believed to be "Murphy's Junk Yard." In actuality, this property was not "Murphy's Junk Yard," but a former machine shop leased by Braswell. Caudill observed a pick-up truck backed up to a Mustang in front of the building with its headlights on and a couple individuals moving about. It was completely dark except for the light emitting from the pick-up truck's headlights. Concerned that the individuals might be engaged in stealing scrap metal or vehicle parts, Caudill stopped to investigate further.

Caudill activated his emergency equipment and pulled his marked patrol car alongside the road at 10:36 p.m., parking approximately thirty to forty feet (or approximately two car lengths) from the front of the building. For officer safety purposes, Caudill chose not to enter the property and approach the men around the truck. Caudill believed it would be unsafe for him to approach them in the wash of the truck's headlights since they could see him but he could not see them. Caudill stepped to the passenger side of his patrol car and asked the men to approach so that he could see them, verify their identities, and ensure that they were not engaged in illegal activities.

The individual later identified as Defendant James Roy Boone was uncooperative. He refused to approach the patrol car, repeated profanities at the officer, and kept placing his hands in his pockets. He appeared to Caudill to be highly agitated. Caudill also heard someone running from the scene. He heard what he believed to be rapid footfalls over the scrap metal and into the tree line.

2

These observations amplified his concerns for his safety. Caudill drew his service weapon, holding it in a "low carry" position, and told Defendant to keep his hands out of his pockets. Caudill also radioed for back-up.

Caudill asked the men what they were doing on the property and told them that he wanted to confirm that they had a right to be there. The men told him that they were hooking a chain to the Mustang to tow it up to a garage. When Caudill asked who owned the Mustang, no one provided a clear answer. The Mustang had no license tag. There was no tow truck or proper towing gear on the property. It would be illegal in North Carolina to tow a vehicle in this manner.

After several minutes of conversation, Defendant and two men later identified as Gerald Pittman and Braswell, approached the patrol car to speak with Caudill. A female later identified as April Miller remained seated in the pick-up truck. Caudill chose to leave Miller inside the vehicle and focus on the three male subjects.

The men each provided identifying information, although Defendant was the only one who produced a North Carolina driver's license. Caudill passed this information on to dispatch via his radio to conduct a check for outstanding warrants. Deputy Sheriff Chad Thomas, who was en route to the scene to provide back-up, heard the call and radioed Caudill a "10-30" code. That code advised Caudill to use extreme caution in dealing with the subjects. Thomas testified that he did not know Defendant but that he knew Pittman and Braswell from prior domestic disturbances and drug activity.

While dispatch ran the men's names, Defendant remained agitated. His pupils were "pin-point" and he could not maintain eye contact with Caudill. He kept placing his hands in his pockets and acted very fidgety. Based on his training, Caudill believed Defendant was under the influence of some sort of stimulant.

Approximately fifteen minutes later, dispatch reported back to Caudill that Defendant had an outstanding order for arrest for a failure to appear on a marijuana charge in Avery County. Caudill chose to minimize the significance of this news when relating it to the Defendant. He believed that Defendant was already highly agitated and potentially dangerous, and did not want to "break any bad news" to him until back-up arrived on scene. Caudill told Defendant that it likely was not a big deal and could be resolved in the future. Caudill intended to arrest Defendant on the warrant once his back-up arrived. The timing of this dispatch was confirmed by Braswell, who overheard the dispatch concerning Defendant's outstanding arrest warrant and asked Caudill about it before Deputy Thomas arrived on the scene. Pittman also heard Caudill talk to Defendant about the warrant before Deputy Thomas' arrival, and advise him that he was not going to serve it.

Things were relatively calm when Thomas arrived on the scene at 11:05 p.m. Thomas recalled hearing dispatch confirming that Defendant had an outstanding warrant. He could not recall whether he heard that communication before or after he arrived on the scene. After checking with dispatch and reviewing records, he confirmed that this report was broadcast prior to his arrival on the scene.

When Thomas arrived on the scene, he asked Caudill if he had patted down the three men for officer safety. Caudill had not because he believed it was dangerous to focus on frisking one individual while the other two stood by. He delayed conducting a frisk for weapons until after his back-up arrived. Thomas then took Defendant to his patrol car and asked to frisk him for officer safety. Defendant refused and launched profanity at Thomas. Thomas began a pat down, at which time Defendant shoved Thomas back with both hands, placed his hand in his pocket, and declared, "I have a f***ing gun and I'm not afraid to use it!" Thomas drew his weapon and shouted to Caudill that Defendant had a gun. Both deputies proceeded to frisk Defendant and retrieve a firearm from

4

his pocket. Defendant was placed under arrest, handcuffed, and seated in the back of Deputy Thomas' patrol car.

Defendant later told the deputies that he had some methamphetamine, marijuana, and pills on his person. A subsequent search revealed that Defendant did have those items in his possession. Defendant had not been given any Miranda warnings prior to making the statement. The Government concedes that it will not seek to offer the statement during its case-in-chief.

The officers left the scene with Defendant in custody at approximately 12:45 a.m.

## II. ANALYSIS

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. Amend IV. Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot not used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974).

Defendant contends that he was unlawfully seized when Deputy Caudill drew his weapon and ordered him to walk off the private property. Defendant also contends that he was subject to a second and separate unlawful seizure when Deputy Thomas directed him to his patrol car to be frisked. Because of these unlawful seizures, Defendant argues that the gun, drugs and pipes recovered from him following his unlawful seizure, as well as statements about alleged drug possession, are fruits of the poisonous tree and must be suppressed. Additionally, Defendant argues that his statement regarding his drug possession was obtained through custodial interrogation and the statement as well as any drugs recovered as a result of that statement must be suppressed.

5

The Fourth Amendment permits a brief, investigatory stop of a person "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). To justify a Terry stop, "the officer must be able to articulate an objectively reasonable suspicion of criminal activity." United States v. Hernandez–Mendez, 626 F.3d 203, 207 (4th Cir.2010), cert. denied, 131 S.Ct. 1833, 179 L.Ed.2d 788 (2011).

Defendant attempts to diminish the basis for Caudill's reasonable suspicion by pointing to facts which, viewed in isolation, suggest that Defendant was not engaged in criminal activity. However, in assessing reasonable suspicion, the Court must examine "the totality of the circumstances." United States v. Foster, 634 F.3d 243, 246 (4th Cir.2011). "The reasonable inquiry is fact-intensive, but individual facts and observations cannot be evaluated in isolation from each other." Hernandez–Mendez, 626 F.3d at 208. Thus, "[e]ven where each individual factor alone is susceptible of innocent explanation, the question is whether, taken together, they are sufficient to form a particularized and objective basis for an officer's suspicions." United States v. Black, 525 F.3d 359, 365–66 (4th Cir.2008) (internal quotation marks and citation omitted).

The United States Court of Appeals for the Fourth Circuit has held that "[r]easonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993); see also United States v. Arvizu, 534 U.S. 266, 273 (2002) (permitting "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'"(quoting United States v. Cortez, 449 U.S. 411, 418 (1981))).

Since the intrusion created by an investigative stop is minimal, the reasonable suspicion

standard is not onerous. See, e.g., United States v. McCoy, 513 F.3d 405, 412-13 (4th Cir. 2008) (experienced officer's observation of vehicles parked briefly in store parking lot where drug sales had previously occurred, then move to another nearby lot where drug sales had also occurred and where occupant of one vehicle got into the other vehicle for a short time, after which that vehicle left at a high rate of speed as officer approached, sufficient to constitute reasonable suspicion); United States v. Harris, 39 F.3d 1262, 1268-69 (4th Cir. 1994) (officer's observation of man leaving apartment in a vehicle after confidential informant advised drug delivery was imminent constitutes reasonable suspicion to stop vehicle); United States v. Turner, 933 F.2d 240, 242-44 (4th Cir. 1991) (officer with experience in narcotics investigations had reasonable suspicion to stop and determine whether subject was "cooking" illegal drugs after observing her carry cup of water out of convenience store, walk to car, and lean over front seat as if hiding something); United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (officer's nighttime observation of man walking away from otherwise deserted area where burglar alarm had just gone off constitutes reasonable suspicion to stop him). However, the officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000).

Various factors may contribute to a finding of "reasonable suspicion." Among them are: (1) presence in a high crime area, United States v. Perkins, 363 F.3d 317, 320-21 (4th Cir. 2004); United States v. Christmas, 222 F.3d 141 (4th Cir. 2000), cert. denied, 531 U.S. 1098 (2001); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); (2) evasive conduct, United States v. Smith, 396 F.3d 579, 585-87 (4th Cir.), cert. denied, 545 U.S. 1122 (2005); United States v. Humphries, 372 F.3d 653, 657-60 (4th Cir. 2004); United States v. Tate, 648 F.2d 939, 943 (4th Cir. 1981) (attempt by subjects to hide their faces); and (3) lateness of the hour, Lender, 985 F.2d at 154.

Being in a "high crime area," standing alone, is not enough to constitute "reasonable suspicion." Illinois v. Wardlow, 528 U.S. at 124. However, it is clearly a relevant factor to be considered in the overall calculus. Id. Accord United States v. Black, 525 F.3d 359, 365-66 (4th Cir. 2008) (being in high crime area combined with other enumerated factors constituted "reasonable suspicion" to detain and frisk defendant); United States v. Mayo, 361 F.3d 802, 804-07 (4th Cir. 2004) (being in high crime area, combined with suspicious, evasive, and nervous conduct constituted "reasonable suspicion" and justified frisk for officer's protection); Christmas, 222 F.3d at 145 ("although [the defendant's] presence in a high crime area is not alone sufficient to justify a Terry stop, the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a Terry analysis").

Applying these well established principles of law to the facts in this case, the Court finds that Caudill had reasonable suspicion to detain Defendant. Caudill testified as to specific facts that, based on the totality of the circumstances, demonstrated a particularized and objective basis for suspecting that Defendant was engaged in criminal activity. Caudill personally observed what he believed to be a vehicle theft in progress. He observed three men attempting to tow away a vehicle without appropriate towing gear, an offense in and of itself, at approximately 10:30 p.m., well after dark and well after normal business hours, in front of a business that had not been open for years. Additionally, Caudill knew this area was a high crime area and one where vehicle parts and scrap metal thefts had been rampant. Caudill believed that he heard someone running away when he first called out to Defendant and the other men to investigate who they were and what they were doing. Finally, Defendant's reaction when Caudill initially approached the men added significantly to his reasonable suspicion. Defendant refused to provide identification and cursed at Caudill. He was fidgety and highly agitated and continually put his hands in his pockets despite numerous demands

to keep his hands visible. Based on all these circumstances, Caudill reasonably concluded in light of his experience that criminal activity may be afoot, and, thus, a Terry stop was warranted.

The Supreme Court has declined to impose a maximum time limit for a permissible investigative stop. United States v. Sharpe, 470 U.S. 675 (1985). "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. at 686. When making this assessment, the Court should give some deference to decisions made by the officer in the field.

> A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing . . . . A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable.

Id. at 686-87.

The length of the investigative stop was brief and reasonable under the circumstances. Less than one hour elapsed between the initiation of Caudill's investigation and Defendant's arrest. However, the relevant time period for Terry purposes was much shorter. Defendant and his associates did not immediately comply with Caudill's request to speak to them. An expression of lawful authority by an officer does not constitute a "seizure" until the target complies or submits. California v. Hodari D., 499 U.S. 621, 623-29 (1991). Caudill testified that it took five to ten minutes for Defendant to approach the patrol car. Furthermore, the encountered ceased being a Terry stop when Caudill received confirmation that there was an outstanding warrant for Defendant. At that moment he had probable cause to arrest Defendant, even if he chose to wait until his back-up arrived.

9

Caudill received notification of the arrest warrant approximately fifteen minutes into his investigation. Both Braswell and Pittman recalled Caudill speaking to Boone about the warrant prior to Thomas's arrival at 11:05 p.m. Thus the seizure for <u>Terry</u> purposes, prior to it becoming an arrest, lasted between ten to fifteen minutes. A <u>Terry</u> stop of less than twenty minutes is consistent with the Supreme Court's notions of brevity. <u>See</u>, <u>e.g.</u>, <u>Sharpe</u>, 470 U.S. at 686 (rejecting a hard-and-fast time limit and holding that a twenty minute Terry stop was reasonable under the circumstances); <u>United States v. Place</u>, 462 U.S. 696, n.10 (1983). Caudill acted reasonably in his investigation into the Defendant's suspicious activities. He requested the men approach him to be identified. Once they finally approached and gave identifying information, he relayed the information to dispatch. After Caudill received confirmation of Defendant's outstanding arrest warrant, approximately fifteen minutes into the encounter, he had probable cause to arrest Defendant.

There was no separate seizure when Deputy Thomas arrived on the scene and directed Defendant to submit to a frisk. Defendant was seized upon his compliance with Caudill's command to approach and provide identification. At the time of Thomas' frisk, the deputies knew of the active warrant and had probable cause to arrest Defendant and conduct a search incident to arrest. The search of Defendant's person was justified as a search incident to arrest. <u>See</u> <u>Chimel v. California</u>, 395 U.S. 752, 763 (1969); <u>see also</u> <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973) (search incident to lawful custodial arrest "is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that [a]mendment"). It is immaterial that Defendant's formal arrest occurred subsequent to the search of his person by Thomas. <u>See</u> <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of [the arrestee's] person, [it is not] particularly important that the search preceded the arrest rather than vice versa."); <u>United States v. Atkins</u>, 16 F. App'x 145, 149 (4th Cir.

2001) ("The fact that Atkins was not formally arrested before the officers took his keys from him and searched the vehicle does not invalidate the search. A search incident to arrest may precede the formal arrest, provided that the formal arrest quickly follows the challenged search and there is probable cause to arrest at the time of the search.(internal quotations omitted)). Therefore, the Court finds that the gun was lawfully seized incident to arrest.

Defendant asserts that his statement about having drugs on his person was obtained in violation of his Miranda rights. The Government concedes that it will not seek to introduce the statement at trial during its case-in-chief. Consequently, the Court finds that the statement should be suppressed.

The suppression of this statement, however, has no impact on the admissibility of the drugs found on Defendant's person after his arrest. Their discovery would have been inevitable following Defendant's arrest. Under the doctrine of inevitable discovery, "information obtained by unlawful means is nonetheless admissible '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" United States v. Allen, 159 F.3d 832, 838 (4th Cir.1998) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). The inevitable discovery doctrine applies when "the facts indicate another search inevitably would have occurred and would inevitably have uncovered the evidence, and that search falls within an exception to the warrant requirement." Id. at 841 (citing United States v. George, 971 F.2d 1113, 1121–22 (4th Cir.1992) (inventory search); United States v. Cotnam, 88 F.3d 487, 496 (7th Cir.1996) (search incident to arrest)). The Court finds that a thorough search of Defendant would have occurred as a matter of policy following his arrest and commitment to jail. Therefore, the suppression of his statement alerting the officers to the presence of the drugs prior to such search, does not require suppression of the evidence. It would have inevitably been discovered.

### III.  RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the Defendant's "Motion To Suppress Evidence" be **GRANTED IN PART** and **DENIED IN PART**. More specifically, suppression of Defendant's oral statement that he had drugs on his person should be granted but otherwise the Motion should be denied.

### IV.  NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen (14) days after service of same. Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Judge. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140, 147 (1985); Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Wells, 109 F.3d at 201; Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; <u>and to the Honorable Martin Reidinger</u>.

**SO RECOMMENDED.**

Signed: February 1, 2012

David S. Cayer
United States Magistrate Judge