# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION

## CRIMINAL CASE NO. 1:11cr80

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | **MEMORANDUM OF** |
| ) | **DECISION AND ORDER** |
| ) | |
| JAMES ROY BOONE. ) | |

**THIS MATTER** is before the Court on the Defendant's Motion to Suppress Evidence [Doc. 16]; the Magistrate Judge's Memorandum and Recommendation [Doc. 30], recommending that the Defendant's Motion to Suppress be granted in part and denied in part; and the Defendant's Objections to the Memorandum and Recommendation [Doc. 35].

## I. PROCEDURAL HISTORY

On October 4, 2011, the Defendant was charged in a Bill of Indictment with one count of possession with the intent to distribute a quantity of methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(B), and with one count of using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). [Doc. 1]. On December 20, 2011, the Defendant filed a Motion to Suppress, arguing that his Fourth Amendment

right to be free from illegal seizure was violated when law enforcement directed him at gun point to leave private property where he was a social guest, and demanded that he submit to a seizure and search over his objection. The Defendant further argued that his Fifth Amendment right against self-incrimination was violated when he was searched based on a statement obtained from him in violation of his Miranda rights. [Doc. 16].

On January 10, 2012, the Honorable David S. Cayer, United States Magistrate Judge, conducted an evidentiary hearing on the Defendant's motion. On February 1, 2012, the Magistrate Judge issued a Memorandum and Recommendation, recommending that the Motion to Suppress be granted with respect to the Defendant's statements that he had drugs on his person and that the Motion be denied in all other respects. [Doc. 30]. The Defendant timely filed Objections to the Memorandum and Recommendation. [Doc. 35].

## II.  STANDARD OF REVIEW

A district court may refer a motion to suppress to a magistrate judge for a recommendation. Fed. R. Crim. P. 59(b)(1). The Court must consider any objection to the magistrate judge's recommendation de novo. Fed. R. Crim. P. 59(b)(3). Where no specific objection is made, however, the Court need "only satisfy itself that there is no clear error on the face of the record in order

to accept the recommendation." Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72, 1983 advisory committee's note).

## III. FACTUAL BACKGROUND

In his Memorandum and Recommendation, the Magistrate Judge made the following findings of fact:

> The events giving rise to this Motion occurred on the evening of January 23, 2011. Mitchell County Deputy Sheriff Phil Caudill was on routine patrol near the Yancey-Mitchell county line in the Estatoe community. Caudill had been a full-time deputy sheriff for approximately three months. Prior to that time, he had served as a reserve deputy for the same department for approximately one year. Caudill's shift Captain had advised him about a rash of copper, scrap metal, and vehicle part thefts in this area. The Captain had ordered extra patrols to deter these crimes. Caudill testified that the Sheriff's Department has responded to hundreds of calls from that area and that he believed it to be the highest crime area in Mitchell county. Defense witness Lee Braswell, who leases the subject property, testified that he took precautions such as keeping odd hours and staying overnight in order to deter potential thefts.
>
> At approximately 10:30 p.m., while on patrol in this area, Caudill drove by a commercial building which he believed to be "Murphy's Junk Yard." In actuality, this property was not "Murphy's Junk Yard," but a former machine shop leased by Braswell. Caudill observed a pick-up truck backed up to a Mustang in front of the building with its headlights on and a couple individuals moving about. It was completely dark except for the light emitting from the pick-up truck's headlights. Concerned that the individuals might be engaged in stealing scrap metal or vehicle parts, Caudill stopped to investigate further.

3

Caudill activated his emergency equipment and pulled his marked patrol car alongside the road at 10:36 p.m., parking approximately thirty to forty feet (or approximately two car lengths) from the front of the building. For officer safety purposes, Caudill chose not to enter the property and approach the men around the truck. Caudill believed it would be unsafe for him to approach them in the wash of the truck's headlights since they could see him but he could not see them. Caudill stepped to the passenger side of his patrol car and asked the men to approach so that he could see them, verify their identities, and ensure that they were not engaged in illegal activities.

The individual later identified as Defendant James Roy Boone was uncooperative. He refused to approach the patrol car, repeated profanities at the officer, and kept placing his hands in his pockets. He appeared to Caudill to be highly agitated. Caudill also heard someone running from the scene. He heard what he believed to be rapid footfalls over the scrap metal and into the tree line. These observations amplified his concerns for his safety. Caudill drew his service weapon, holding it in a "low carry" position, and told Defendant to keep his hands out of his pockets. Caudill also radioed for back-up.

Caudill asked the men what they were doing on the property and told them that he wanted to confirm that they had a right to be there. The men told him that they were hooking a chain to the Mustang to tow it up to a garage. When Caudill asked who owned the Mustang, no one provided a clear answer. The Mustang had no license tag. There was no tow truck or proper towing gear on the property. It would be illegal in North Carolina to tow a vehicle in this manner.

After several minutes of conversation, Defendant and two men later identified as Gerald Pittman and Braswell, approached the patrol car to speak with Caudill. A female later identified as April Miller remained seated in the pick-up truck. Caudill chose to leave Miller inside the vehicle and focus on the three male subjects.

The men each provided identifying information, although Defendant was the only one who produced a North Carolina driver's license. Caudill passed this information on to dispatch via his radio to conduct a check for outstanding warrants. Deputy Sheriff Chad Thomas, who was en route to the scene to provide back-up, heard the call and radioed Caudill a "10-30" code. That code advised Caudill to use extreme caution in dealing with the subjects. Thomas testified that he did not know Defendant but that he knew Pittman and Braswell from prior domestic disturbances and drug activity.

While dispatch ran the men's names, Defendant remained agitated. His pupils were "pinpoint" and he could not maintain eye contact with Caudill. He kept placing his hands in his pockets and acted very fidgety. Based on his training, Caudill believed Defendant was under the influence of some sort of stimulant.

Approximately fifteen minutes later, dispatch reported back to Caudill that Defendant had an outstanding order for arrest for a failure to appear on a marijuana charge in Avery County. Caudill chose to minimize the significance of this news when relating it to the Defendant. He believed that Defendant was already highly agitated and potentially dangerous, and did not want to "break any bad news" to him until back-up arrived on scene. Caudill told Defendant that it likely was not a big deal and could be resolved in the future. Caudill intended to arrest Defendant on the warrant once his back-up arrived. The timing of this dispatch was confirmed by Braswell, who overheard the dispatch concerning Defendant's outstanding arrest warrant and asked Caudill about it before Deputy Thomas arrived on the scene. Pittman also heard Caudill talk to Defendant about the warrant before Deputy Thomas' arrival, and advise him that he was not going to serve it.

Things were relatively calm when Thomas arrived on the scene at 11:05 p.m. Thomas recalled hearing dispatch confirming that Defendant had an outstanding warrant. He could not recall whether he heard that communication before or after he arrived on the scene. After checking with dispatch and reviewing records,

5

he confirmed that this report was broadcast prior to his arrival on the scene.

When Thomas arrived on the scene, he asked Caudill if he had patted down the three men for officer safety. Caudill had not because he believed it was dangerous to focus on frisking one individual while the other two stood by. He delayed conducting a frisk for weapons until after his back-up arrived. Thomas then took Defendant to his patrol car and asked to frisk him for officer safety. Defendant refused and launched profanity at Thomas. Thomas began a pat down, at which time Defendant shoved Thomas back with both hands, placed his hand in his pocket, and declared, "I have a f***ing gun and I'm not afraid to use it!" Thomas drew his weapon and shouted to Caudill that Defendant had a gun. Both deputies proceeded to frisk Defendant and retrieve a firearm from his pocket. Defendant was placed under arrest, handcuffed, and seated in the back of Deputy Thomas' patrol car.

Defendant later told the deputies that he had some methamphetamine, marijuana, and pills on his person. A subsequent search revealed that Defendant did have those items in his possession. Defendant had not been given any Miranda warnings prior to making the statement. The Government concedes that it will not seek to offer the statement during its case-in-chief.

The officers left the scene with Defendant in custody at approximately 12:45 a.m.

[Doc. 30 at 1-5].

The Defendant does not make any specific objections to the factual background as recited by the Magistrate Judge in the Memorandum and Recommendation. Upon careful examination of the entire record in this case,

6

the Court finds that the Magistrate Judge's findings of fact as set forth in pages 1 through 5 of the Memorandum and Recommendation are correct and deserving of adoption by this Court. These findings are therefore adopted as incorporated herein.

## IV. DISCUSSION

The Defendant first argues that, based on the totality of the circumstances, Deputy Caudill did not have reasonable suspicion to conduct an investigative stop of the Defendant. [Doc. 35 at 2-3].

"An officer may stop and briefly detain a person 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" United States v. Montieth, 662 F.3d 660, 665 (4th Cir. 2011) (quoting United States v. Hensley, 469 U.S. 221, 227, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). To justify an investigative stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Thus, a court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity." United States v. Foster, 634 F.3d 243, 246 (4th

Cir. 2011). "Factors which alone may be 'susceptible of innocent explanation' can 'form a particularized and objective basis for a stop when taken together.'" United States v. Glover, 662 F.3d 694, 698 (4th Cir. 2011) (quoting United States v. Arvizu, 534 U.S. 266, 277-78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

The Defendant argues that the Fourth Circuit's recent decision in United States v. Foster, 634 F.3d 243 (4th Cir. 2011), requires the Court to evaluate each of the individual reasons cited by the Government in support of reasonable suspicion and to "determine the credibility of each reason" before examining the totality of the circumstances. [Doc. 35 at 3]. The Defendant misreads the Foster decision. In Foster, the Fourth Circuit reiterated the well-established rule that the reasonableness of an investigative stop is determined by the totality of the circumstances. Foster, 634 F.3d at 248 ("We recognize that we must look to the totality of the circumstances when evaluating the reasonableness of a stop."). The Court went on to note, however, that the Government cannot simply label innocuous behavior as "suspicious" in order to meet its burden. Id. Rather, the Court noted, "[t]he Government must be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that

8

the behavior is likely to be indicative of some more sinister activity than may appear at first glance." Id.

Turning to the particular facts presented in Foster, the Court found that the Government relied upon three factors to justify the stop of the defendant: (1) the officer's prior knowledge of the defendant's criminal record; (2) the defendant's sudden appearance from a crouched position in a parked car after apparently being warned that the officer was approaching; and (3) the defendant's "frenzied arm movements" within the car. Id. at 246. After addressing each of these factors separately, the Court concluded that "without some stronger indication of criminal activity -- the articulated facts, collectively, could not have supplied an officer with the appropriate amount of suspicion necessary for a Terry stop." Id. at 248. The Defendant's suggestion that Foster somehow required the Magistrate Judge to conduct a more detailed inquiry into "the credibility of the individual facts" articulated by the officer before analyzing such facts collectively is simply erroneous.

Moreover, Foster is distinguishable upon its facts. Unlike in Foster, where the Fourth Circuit concluded that the articulated reasons did not provide a strong indication of criminal activity, the officer in the present case articulated a particularized and objective basis for suspecting that the

9

Defendant was engaged in a criminal act. As the Magistrate Judge properly found, Deputy Caudill personally observed what he believed to be a possible theft in progress. He observed three men attempting to tow away a vehicle without appropriate towing gear, an offense in and of itself, at approximately 10:30 p.m., well after dark and well after normal business hours, in front of a business that had not been open for years. Additionally, Deputy Caudill knew this area to be a high crime area and one where vehicle parts and scrap metal thefts had been rampant.

Further, when Deputy Caudill initiated his investigative stop and called out to the Defendant and the other men to investigate who they were and what they were doing, he believed that he heard someone running away from the scene, a fact which reasonably heightened his suspicion that criminal activity was afoot. Additionally, when Deputy Caudill initially approached the Defendant and the other men on the scene, the Defendant refused to provide identification and cursed him. He further noted that the Defendant was fidgety and highly agitated and continually put his hands in his pockets despite numerous demands to keep his hands visible. Based on the totality of these circumstances, the Magistrate Judge correctly concluded that Deputy Caudill

possessed reasonable suspicion to stop and briefly detain the Defendant. The Defendant's first objection, therefore, is overruled.

Next, the Defendant challenges the search and seizure which occurred when Deputy Thomas arrived on the scene and directed the Defendant to submit to a frisk. In the Memorandum and Recommendation, the Magistrate Judge concluded that at the time of this frisk, both Deputy Thomas and Deputy Caudill knew of an outstanding warrant for the Defendant's arrest and therefore had probable cause to arrest the Defendant and conduct a search incident thereto. Accordingly, the Magistrate Judge concluded that Deputy Thomas's frisk of the Defendant was lawful and that the gun discovered on the Defendant's person during this frisk was lawfully seized. [Doc. 30 at 10-11].

The Defendant objects to this conclusion, arguing that Deputy Thomas did not have reasonable suspicion to effectuate a separate seizure of the Defendant. Specifically, he contends that it is not clear from the record whether Deputy Thomas was aware of the Defendant's outstanding arrest warrant. Further, citing United States v. Massenburg, 654 F.3d 480 (4th Cir. 2011), the Defendant argues that any facts underlying Deputy Caudill's

suspicions could not be imparted to Deputy Thomas, and therefore Deputy Thomas's frisk of the Defendant was unwarranted. [Doc. 35 at 3-4].

The Defendant's arguments must be rejected. Contrary to the Defendant's argument, Deputy Thomas's frisk of the Defendant did not constitute a second seizure requiring the articulation of additional reasonable suspicion. At the time of Deputy Thomas's frisk, the Defendant was already "seized." The Defendant's seizure was effectuated when he first complied with Deputy Caudill's command to approach and be identified, and that seizure remained in effect until his formal arrest.

Once reasonable suspicion exists to justify an investigative stop, an officer may conduct a limited pat-down for officer safety. Terry, 329 U.S. at 27, 88 S.Ct. 1868; United States v. Burton, 228 F.3d 524, 527-28 (4th Cir. 2000). In this case, Deputy Caudill could have conducted a Terry frisk prior to Deputy Thomas's arrival, but he elected not to do so until back-up arrived, due to concerns for his personal safety. Deputy Thomas's pat-down of the Defendant was part of the investigative stop and therefore did not constitute a second seizure requiring a separate basis for reasonable suspicion.

The Magistrate Judge's finding that both Deputy Caudill and Deputy Thomas were aware of the outstanding arrest warrant is supported by the

record. Deputy Caudill testified that he received this information prior to Deputy Thomas's arrival on the scene. [Supp. Hrg. Transcript, Doc. 29 at 27]. While Deputy Thomas could not recall during the suppression hearing exactly when it was that he received the report from dispatch, he testified that he recalled hearing the dispatch report at some point that evening. [Id. at 76-77]. He later confirmed through dispatch records that the call went out prior to his arrival on the scene. [Id. at 86]. In light of these facts, there can be little dispute that both officers knew about the outstanding warrant prior to the search that led to the discovery of the firearm on the Defendant. Once the existence of the warrant was known to the officers, there was probable cause to arrest the Defendant and to conduct a search incident thereto. Additional reasonable suspicion on the part of Deputy Thomas therefore was not required in order to conduct a frisk and search.

The Massenburg decision does not compel a different conclusion. In Massenburg, two officers responded to an anonymous tip about shots having been fired in a high crime area. Massenburg, 654 F.3d at 483-84. They split up to investigate, and one encountered four individuals, including the defendant. Id. at 484. The officer asked the men from his patrol car if they would talk to him, and he asked them if they heard gunshots. They voluntarily

complied and stated that they heard the shots approximately two blocks south of their location.  Id.  When the other officer arrived they exited their patrol cars and began to take down the men's names.  Id.  One of the officers asked the men if they would consent to be searched.  Two of the men complied voluntarily, but Massenburg did not.  Id.  He was "hesitant and stand-offish," and instead of complying stated that he did not need to be searched, then "air-patted himself down . . . trying to show he didn't have anything."  Id.  The officer nevertheless frisked him involuntarily and felt the grip of a gun in his waistband, whereupon Massenburg took flight.  Id.  Following a brief chase, Massenburg was apprehended and the police recovered a gun and a small amount of marijuana. The other officer testified that prior to the frisk he observed what he believed to be a small bulge in Massenburg's jacket (not his waistband), but that he did not communicate this to the frisking officer.  Id.

The Fourth Circuit held that, based on the totality of the circumstances, the officers lacked a sufficient basis upon which to perform a Terry frisk.  Id. at 491.  The Fourth Circuit further rejected the Government's argument that the non-frisking officer's uncommunicated observation of a bulge in Massenburg's jacket could be imputed to the frisking officer under the

14

"collective-knowledge doctrine" and thus serve as a basis for reasonable suspicion to conduct the frisk. Id. at 491-92.

Massenburg is distinguishable from the instant case. First, for the reasons noted above, the basis for Deputy Caudill's reasonable suspicion for initiating an investigative stop of the Defendant is supported by a much greater amount of articulable facts than the basis cited by the officers in Massenburg. Based upon these articulable facts, Deputy Caudill was entirely justified in performing a Terry frisk of the Defendant. He reasonably elected not to do so, however, until back-up arrived due to safety concerns. By the time Deputy Thomas arrived, both officers had been advised of the Defendant's outstanding arrest warrant. The existence of this valid warrant eliminated other Fourth Amendment concerns, for at that point the officers had probable cause to arrest the Defendant and conduct a search incident thereto. As such, a finding of reasonable suspicion was no longer required in order to conduct a pat-down of the Defendant.

Because Deputy Thomas's search and seizure of the Defendant was lawful, the Defendant's second objection is also overruled.

## V. CONCLUSION

For the reasons stated herein, the Court concludes that the Magistrate Judge's findings of fact are correct and that his conclusions of law are consistent with current law. Accordingly, the Court overrules the Defendant's objections to the Memorandum and Recommendation and hereby accepts the Magistrate Judge's recommendation that the motion to suppress be granted with respect to the Defendant's statement that he had drugs on his person. In all other respects, the motion to suppress is denied.

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Objections to the Memorandum and Recommendation [Doc. 35] are **OVERRULED**; the Magistrate Judge's Memorandum and Recommendation [Doc. 30] is **ACCEPTED**; and the Defendant's Motion to Suppress Evidence [Doc. 16] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Defendant's oral statement that he had drugs on his person is suppressed. In all other respects, the Defendant's Motion to Suppress is denied.

**IT IS SO ORDERED.** Signed: March 8, 2012

Martin Reidinger
United States District Judge